## THE CUZCO.

(District Court, E. D. New York. June 25, 1906.)

1. SEAMAN—INJURY IN SERVICE—LIABILITY OF SHIP.

The injury of a seaman by falling through a partially uncovered hatchway on a steamship in the dark *held* due to his own negligence, and one for which the ship was not liable; it appearing that he knew that the hatch was usually kept open at least in the daytime and that there was a light burning within a few feet of it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Seamen, §§ 189, 190.]

2. SAME—FAILURE OF VESSEL TO PROCURE MEDICAL ATTENTION.

A steamship *held* liable in damages to a seaman whose shoulder was dislocated by an accident on the voyage, where neither the master nor any one else on board had sufficient medical knowledge to determine whether or not there was a dislocation, and there was a port with medical facilities 70 miles distant which they had passed, but, instead of going there to procure the service of a physician, the master proceeded on the voyage to the next port, 1,100 miles distant, which in good weather required five days, and in fact took eight days.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Seamen, §. 187.]

In Admiralty. Action by seaman for personal injury.

Abbott & Coyne (B. B. Coyne, of counsel), for libelant.

Convers &. Kirlin (J. Parker Kirlin and Charles Hickox, of counsel), for claimant.

THOMAS, District Judge. The libelant, a chief cook, was injured, while in the Straits of Magellan, by falling through a hatchway on the bridge deck, when the ship was at anchor at Fortescue Bay on account of bad weather. At about 4:30 o'clock, on August 24th, while it was snowing and yet dark, the libelant went to get the key of the galley from the officer on the bridge, making his way forward on the port side, and returning by the starboard side. The following Exhibit 2 is a plan of the bridge deck:

From the hatch in question, marked "A," two covers had been removed, leaving an open space fore and aft of 3 feet 4 inches. The distance between the house and the nearest side of the hatch at the for-

ward corner is 4 feet 11 inches. The distance from the rail to the starboard side of the hatch is 4 feet 8 inches, a portion of which space is taken by the rail space or stanchion, leaving a clear space of 3 feet 6 inches. The hatch was 12 feet long, by 4 feet wide, and was surrounded by a coaming 11½ inches high. The after end of the hatch was 8 feet from the front of the house, marked "2nd Eng'r," whereon at B was a bulb for an electric light, 5 feet 4 inches above the deck. There was a similar arrangement on the port side of the ship. There was also provision for an electric light at the point marked "L," but the light at L did not light the hatch.

The libelant describes the accident as follows:

"I turned out in the morning on the 24th of August, 1903, I think about 20 minutes or half past 4 in the morning. I went up on the bridge deck, and went around the galley on the port side to go to the bridge deck to the officer to get a key from the officer. By arriving there the second mate had gone below already, and the chief mate called him back again for to bring me the key, which he brought in about 5 minutes afterwards—letting me stand that long there. I got the key and went along back again on the starboard side, and i came on this part, just passing the bridge, and went to the rail, and by coming back I fell into the hatch and from that time I remember no more until the steward came to my room and washed me, and I came to my senses again."

The captain saw the libelant at 7 o'clock, after the accident, and testified:

"He told me he went to get the key from the officers on the bridge; and, walking backwards, he went out to the rail, and when he stepped backwards he forgot about the hatch. That is what he told me."

The captain further states that, unless bad weather prevented, the hatch on the starboard side was kept open during the day and at night to allow access to the coal bunkers, as there was no other entrance thereto except on the main deck through the boiler room, through doors which were water tight and kept closed, but could be opened unless the coal placed in that locality prevented, and that the coal was not sufficiently low at the time of the accident to permit such entrance.

Williams, the second cook, testified that for the purpose of removing the libelant from the main deck, where he lay after the fall, he went into the bunker from the main deck, and took the libelant out through the door into the passageway. According to this evidence, there was a clear entrance to the bunker without going through the hatch. Nevertheless, the captain of the vessel had a right to keep the hatches off, provided the libelant was treated fairly with reference to them. The libelant knew that the covers were off in fair weather during the day, but denies that he had such knowledge that the removal continued at night, as he says that previous to the morning in question he had not been forward in the dark. According to his statement, the hatch was 18 or 20 feet forward of his galley door and in sight of it. The libelant's knowledge that the hatch was usually kept open in the daytime was a warning which he should have heeded. Hence he should have used more care in approaching it.

The claimant's evidence tends to show that the electric light was burning at the point, B, on the starboard side, and that there was a similar light in front of the chief engineer's room on the port side.

The libelant does not deny that there was an operative light on the port side, but insists that is was shut off on the morning in question, and in this he is corroborated by the second cook, Williams, and the seaman Bill. These three men also state that the light was not going at B, and had not been during the voyage. Indeed, the libelant states that there was a place for an electric light, but that the outside glass was boarded over, so that "it was closed up; there was no light around there; it was always dark on that side," Williams, the second cook, testified that there was no bulb, and then:

"There was only a frame,—one of these round glasses that is used to keep the bulb. There was just the iron frame and no glass at all. Q. You could look right through the iron frame and see there was no bulb there? A. Yes, sir."

Bill testified as follows:

"Q. Will you state whether there was an electric light bulb in the place shown in Exhibit No. 6? A. No, sir; there was no bulb there. I am sure of that. Q. Did you ever see that light going behind the third engineer's room from the time you left NewYork until the accident happened? A. No; that light was never going. Q. Those lights were never going on that deck? A. On the port side from the chief engineer's room when he had a light burning in his room, that showed a light on the deck. Q. On which side of the deck? A. Port side."

This witness further testifies:

"Q. Were the dynamos going on the vessel on this day? A. Yes; when I commenced at 4 o'clock, I tried to switch the light on, but there were no dynamos and the light would not burn. Q. Were they going on August 24th? A. Not at 4 o'clock. When the accident happened, they were not going, and that was about a quarter after 4. The captain did not come up until after 5. At 5 we called all hands. Then the captain was called and he came up."

So that the libelant and his two witnesses not only testify that there was no light near the hatch, but also that there was no opportunity for a light. The master, Dexter, Crieg, the chief engineer, Morse, the steward, Gibson, the chief officer, Williamson, the second officer, testified with reference to the lights. The evidence of these witnesses establishes that the starboard light was in an operative condition; that it had been so during the voyage; that it had usually been lit when the vessel was in port, and had not been used when the vessel was at sea; that the light had been in operation on the night in question before the accident, and was in operation after the accident. It is true that none of these witnesses saw the light at the immediate time of the accident, and because no one of them can speak with precision as to the condition at that exact moment it is urged that the statements of the libelant and his witnesses should be adopted. But it is thought that the libelant and his witnesses are so clearly wrong in their statement as to the inoperative condition of the light that their evidence should not be preferred to that of the claimant's witnesses, who showed conditions before and after the accident indicating that the light was in operation at the time the accident happened. This conclusion is strengthened by the fact that the vessel went to sea at about 6 o'clock, and it is highly improbable that between 4 and 5 o'clock the lights were not in operation, especially as the mast and side lights were electric. As to this the master testified:

"Q. A man named Bill has been examined, who states that he went up on the bridge about or shortly after 4 o'clock, and that your side lights were then burning, but that the kerosene lights were lit, instead of the electric lights. What is the fact about that? A. That is rot, that is. Q. Why do you say it is rot? A. Well, there was no necessity for it. The ship was at anchor, and there would be no necessity for the kerosene lights unless the dynamo was completely broken down, or unless the whole switch was blown out in the section. Q. If you were getting ready to go to sea with immediate side lights, what lights would you use? A. Electric lights. Q. Unless the dynamo was broken down? A. Unless the dynamo was broken down."

At 7 o'clock, when the ship was under way, the captain went to see the libelant, and, although the latter's arm was much swollen, made an examination and concluded that the shoulder was not dislocated, because there was no downward projection. The dislocation was upward, which accounted for the absence of the symptom for which the captain was looking. The ship was then 70 miles from Punta Arenas, whence she had sailed on August 23d, anchoring at Fortescue Bay, where the accident happened. The distance from Fortescue Bay to Coronel is about 1,100 miles, which should, under favorable circumstances, be made in five days; but, on account of adverse conditions, the ship was seven or eight days in arriving at that point. The dislocation was then reduced by a doctor, and the ship proceeded to Valparaiso, where a physician came on board and remained until October 1st, furnishing the libelant with proper attention. Although the libelant before that time aided somewhat in the galley, he did not do full work until October 16th, when he took full charge, and so continued until the vessel reached New York on January 6th or 7th. The accident happened before 5 a. m. The ship was not under way until 6 a. m. The cargo was not perishable. The distance to Punta Arenas, a place of 5,000 inhabitants and supplied with medical facilities, was 70 miles. The injury was obviously serious and painful. The master and steward did not have capacity to discover the nature of the injury. The distance to the next port was at least five days, and adverse weather, not unexpectable, would prolong it. Taking all this into consideration, the master should have used a few hours to reach a known port where there was medical aid. It is urged that the master did not know how serious the injury was or the danger of delay; but he was conscious of his own ignorance, and had no right to imperil the libelant. He should have gone to the port he had just left to gain the medical knowledge.

If the matter involved seamanship, the master's judgment would be entitled to great respect. But of the matter in hand he knew that he did not know, and that none aboard knew. But he did know that a man had fallen through a hatch, and that he had received substantial injury. It was his duty to secure advice at the neighboring port. His failure to do so probably aided the resulting abnormal condition of the libelant's arm, and added to his pain and discomfort, and it is thought that the sum of $1,500 is a proper compensation for the claimant to make therefor.